08 CV 7337

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – x

MAGNOLIA GREEN DEVELOPMENT, LLC,
PHILIP PILEVSKY, and RAYMOND L.
ZIMMERMAN,

**COMPLAINT**

               Plaintiffs,

Civil Action No.

   -against-

**JURY TRIAL DEMANDED**

iSTAR FINANCIAL, INC.

RECEIVED
AUG 18 2008
U.S.D.C. S.D. N.Y.
CASHIERS

             Defendant.

– – – – – – – – – – – – – – – – – – – – – – – – – x

     Plaintiffs Magnolia Green Development, LLC ("Magnolia"), Philip Pilevsky, and

Raymond L. Zimmerman, by their attorney Ruskin Moscou Faltischek, P.C., as and for

their Complaint herein against defendant iStar Financial, Inc. ("iStar"), allege as follows:

### Preliminary Statement

    1.  This case arises from defendant iStar's illegal threat to seize control of a viable

and valuable 3,500 residential home and commercial development project.  Defendant

iStar unlawfully has declared a default – violating state and federal law and the governing

loan documents, simply so that iStar can lay claim to the project's extraordinary projected

profits, which iStar sees as a quick fix for its sagging balance sheet.  Plaintiffs seek a

declaratory judgment establishing that the loan is not in default, relief pursuant to Section

2201 of Title 28 of the U.S. Code declaring and adjudicating plaintiffs' federal rights,

contract damages in an amount estimated to exceed $250 Million, punitive damages and

appropriate equitable relief.

**Parties**

2.    Plaintiff Magnolia, is and was, at all relevant times, a limited liability company organized and existing under the laws of the Commonwealth of Virginia.

3.    Plaintiff Philip Pilevsky is and was, at all relevant times, a resident of the State of New York, with a place of business in the City and State of New York. Pilevsky, a well known real estate entrepreneur with over 35 years of experience in acquisitions, development, ownership and management, procured the contract to purchase, and developed the concept for, the real property subject hereof.

4.    Plaintiff Raymond L. Zimmerman is and was, at all relevant times, a resident of the Commonwealth of Virginia. Zimmerman has no less than 25 years experience in hands-on "ground-up" real property development.

5.    Upon information and belief, defendant iStar is and was, at all relevant times, a corporation organized under the laws of the State of Maryland.

**Jurisdiction and Venue**

6.    The Court has federal question jurisdiction over this case pursuant to 28 U.S. Code § 1331 as the matter in controversy involves claims under federal law including section 365 of Title 11 of the U.S. Code. In addition, the Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum or value of $75,000.00, and is between citizens of different states.

2

7.    Venue lies in this Court by virtue of 28 U.S.C. § 1391(b) in that defendant resides in this District and a substantial part of the events giving rise to the claims occurred in New York.  The case and underlying transaction have substantial contacts with the selected forum state, insofar as both corporate parties have offices here and defendant is a publicly traded company listed on the New York Stock Exchange with its principal executive office in New York.  Moreover, the parties have expressly, contractually stipulated to personal jurisdiction and venue in this District for claims arising from the contracts at issue here.

## **Fact Allegations**

8.    Upon information and belief, defendant iStar is a publicly traded corporation, heavily engaged in the financing of real estate development projects whose earnings, stock price and overall financial viability have recently plunged drastically.  For example, in January 2007, when the loan was issued, defendant's stock price was $47 per share, translating to a market capitalization of approximately six billion ($6,000,000,000.00) dollars.  As of the present time, defendant's stock price is less than $7 per share, and the market capitalization has reduced to approximately $860 million, the equivalent of an 85% loss.  Further, as reported by defendant on or about February 28, 2008, defendant suffered a loss of $78.7 million for its fiscal fourth quarter and recorded a $134.9 million write down of its corporate and debt portfolio.  In addition, according to

3

defendant's reports, its "non-performing loans" and "watch list loans" increased in 2007 to almost $2 billion, an increase of more than 900%.

9.     Defendant has been beset by several massive shareholder-derivative lawsuits which, upon information and belief, allege that defendant violated federal securities laws. *See, e.g., Citiline Holdings, Inc. v. iStar*, Civ. 08-3879 (RWS); *Arnold v. Sugarman*, Civ. 08-3664 (RWS); *Cristenson v. iStar*, Civ. 08-3612 (RWS).

10.     Upon information and belief, defendant's wrongful actions targeted at plaintiff Magnolia, including defendant's attempt to seize control and ownership of the Magnolia Project have been motivated and influenced by defendant's precarious and embattled financial and legal condition, including the multiple legal actions now pending against it in this Court.

11.     Upon information and belief, because of the substantial adverse change in defendant's financial condition in the last year, defendant's own financial condition and prospects have motivated – albeit improperly – defendant's misguided efforts described hereinafter to throw Magnolia's real property development project into turmoil enabling defendant to take over Magnolia's property and to reap windfall benefits and profits therefrom.

**The Magnolia Green Project**

12.     In March 2006, with a mortgage loan financed from MMA Financial Holding Inc. ("MMA"), Magnolia purchased approximately 1,898 acres of undeveloped

4

land (the "Real Property") in Chesterfield County, Virginia, located near the City of Richmond, for the purpose of developing the site with approximately 3,500 ready-to-build lots ("Lots") with all requisite site work and infrastructure in place so that Lots can be sold to builders for construction thereon of mostly single-family and multi-family residential dwelling units, and also offices, retail space, and amenities including a school and a 72-par Nicklaus-designed, 18-hole golf course (the "Golf Course").    The development of the Real Property with the requisite infrastructure and other site work described hereinafter, readied for construction, is referred to as the "Project".

13.    As the "master developer" of the Project, Magnolia is charged with completion of all "soft cost" development (the "Predevelopment Work") before any physical site work can be commenced at, around and to the Real Property. Predevelopment Work includes, but is not limited to, budgeting and economic modeling, preparation of plans, maps and surveys, engineering design, securing various governmental licenses, permits, approvals, consents and clearances from governmental, municipal and other public bodies and agencies including those overseeing zoning, building, planning, land use, environmental impacts, and community development. For this Project, the Virginia Department of Historical Resources, Virginia Department of Conservation and Recreation, and the U.S. Army Corps of Engineers also imposed approval procedures. (Collectively, all of the foregoing, together with other permits and approvals needed for the Project work, "Governmental Approvals".)

5

14.   After the Governmental Approvals process would be sufficiently completed, site work could be engaged in; including, without limitation, clearing, grading, deforestation and drainage, installation of sanitary systems, implementation of environmental protections, installation of street lighting and utility services (water, sewer, gas, cable and telephone), construction of roads and other infrastructure, and supervising and working with contractors in performing all of the foregoing (collectively, the "Infrastructure"). As described hereinafter, compounding the Predevelopment Work and Infrastructure for the Project, as unusual conditions to issuance of critical Governmental Approvals, the municipalities also demanded extensive offsite improvements and development.

15.   In order to handle the scope of this enormous Project, the development, construction, and completion of the Infrastructure of the Project was divided into four "Phases," each corresponding to a different area of the Real Property. Each Phase is broken into sections, substantial areas planned for one-family homes, others for multi-family housing, commercial (office) construction, community amenities, parks and the Golf Course ("Sections"). Sections designated for one-family homes are further divided into home building lots (" Lots"). Annexed hereto as Exhibit A is a diagram of the Real Property prepared by a licensed engineer indicating the Phase, Section and Lot divisions of the Real Property.

16.    Phase 1, the first portion of the Real Property to be developed, is burdened with the engineering and design costs of, and much of the work and attendant costs of the Infrastructure for, all four Phases of the Project. As the master developer, Magnolia must oversee all Project expenses, including, but not limited to, the preparation of plans, maps and surveys; civil engineering for the creation of roads, lighting, utilities, sanitary and storm sewers and drainage; all wetlands and environmental protection; the "hard costs" for land clearing and grading; access road construction; installation of street lighting, storm drainage, high speed telecommunications and cable TV and Internet lines.

17.    During the Predevelopment and Infrastructure Work, Sections were and continue to be marketed for sale to independent local and regional builders ("Builders"). Since shortly after acquisition of the Real Property, Magnolia has been negotiating and procuring letters of intent with Builders, leading to executory contracts of sale, for several various Sections.

18.    As of this date, Builders have negotiated or contracted to purchase Lots from Magnolia for an aggregate sales price of more than $240 million, with signed sales contracts totaling well over $100 million; and a substantial number of Lots in Phase 1 have been or will shortly be completed and ready for sale closings. Builders have been entering into contracts for homeowner construction, are in the process of constructing some, and have closed on others. Some homes already have families living in them.

7

19.    The work on the Project is progressing apace after an extensive delay beyond Plaintiffs' control caused by unusual Governmental Approval requirements (discussed in detail hereinafter), with sales continuing, both from Magnolia to Builders and from Builders to homeowners. Barring further disruption by defendant, a substantial number of additional Lots will be available for sale over the next 12 months as the development of Phase 1 is substantially in place, and the Golf Course, a major amenity of the Project, is approximately 70% complete with completion anticipated in approximately six months.

### The iStar Loan

20.    In August 2006, defendant began to court Magnolia with iStar's construction financing proposal based on defendant's evaluation of the Real Property having an "as is" appraised fair market value of $105,000,000.00, without any completed site work.

21.    Defendant proposed a loan of $78,750,000.00, a substantial portion thereof, $52,500,000, to be used to pay off Magnolia's acquisition mortgage financing, together with a revolving credit facility (in addition to the $78 million loan) to complete the Infrastructure, and with costs also to be funded on a rolling basis with proceeds from consummated sales of Sections to Builders. Subsequently, iStar reneged on the revolving credit facility.

22.    Defendant required that, in order to have iStar engage in its due diligence processes, Magnolia was prohibited from continuing its negotiations with, or seeking potential other lenders, in addition to paying defendant $150,000 as an "expense deposit" to defray iStar's pre-closing third-party reports and other due diligence costs.

23.    No pre-closing "commitment letter" was issued; closing requirements and conditions were conveyed to plaintiffs in various communications between iStar's officers.

24.    In addition to the letters of intent already entered into with Builders, amongst the other pre-closing requirements, Magnolia was required to execute contracts with those Builders ("Lot Sale Agreements").  Until Lot Sale Agreements sufficient in number to satisfy defendant were duly executed and delivered, to be assigned at closing to defendant as additional collateral, defendant would not close.  In order to satisfy defendant, plaintiffs intensified its efforts with the Builders and entered into Lot Sale Agreements with sale prices aggregating approximately $100 million, with $1,142,500 of down payments thereunder.

25.    On or about January 5, 2007, Magnolia and defendant closed the $78,750,000 loan (the "Loan"), albeit without the initially proposed revolving credit facility that iStar had proposed, evidenced by a Loan and Security Agreement (the "Loan Agreement") and other associated documents and agreements.  A copy of the Loan

Agreement (without schedules and exhibits) is attached hereto as Exhibit B and incorporated by this reference.

26.    At closing, evidencing the Loan amount, Magnolia executed a restated promissory note (the "Restated Note"), secured by a new deed of trust granting Defendant a first mortgage lien on the Real Property.  The substantive terms of the Note, including its payment provisions, are set forth therein by reference to and incorporation of the provisions of the Loan Agreement.  A copy of the Restated Note is attached hereto as Exhibit C and incorporated herein by this reference.

27.    After payment of the acquisition loan and Lender's fees and other closing costs, the balance of the Loan in the amount of $23,000,000 was retained by Lender to be disbursed for Infrastructure costs (approximately $15.2 million) and for monthly interest payments ($7.8 million).  Also, Magnolia assigned to defendant all of its interest in the existing and future Lot Sale Agreements executed between Magnolia and Builders.

28.    Defendant required Pilevsky and Zimmerman (together "Guarantors") to execute and deliver three guaranty documents (the "Guaranties").  One guaranty, entitled "Limited Payment", determined a dollar amount of exposure pursuant to a complex formula.   The second, termed "Payment and Performance (Completion)," provided that work required by Lot Sale Agreements would be completed; the third guaranty was for "Recourse Carveouts."

10

29.     Copies of the Guaranties are annexed as Exhibit D and incorporated herein by this reference.  The Loan Agreement, the Restated Note, the three Guaranties, and all the documents evidencing and securing the Loan, are collectively referred to hereinafter as the "Loan Documents."

30.     Set forth in one or more of the Loan Documents are provisions that waive certain borrower and guarantor rights – rights that are granted and universally enforced as inviolable pursuant to New York statutory provisions and common law; including, but not limited to, waivers of rights of equity of redemption and benefits of deficiency calculations that would prevent defendant from a windfall recovery of more than what would be then owed to defendant under the Loan Documents.

### The Loan "Balance" Requirement

31.     The provisions of Section 3.2(D) of the Loan Agreement state that Magnolia purportedly is required to keep the Loan "in balance," as determined *reasonably and in good faith* by defendant, by making deposits into an Infrastructure reserve to cover the costs of construction underway at any given time.   Defendant expressly covenanted to act both "*reasonably*" and in "*good faith*" in making the relevant balancing estimates under Section 3.2(D) of the Loan Agreement.

32.     At closing, when the relevant projected Project costs were $44 million, and the Infrastructure reserve was funded with only $15.2 million of Loan proceeds, no deposits were required.  In fact, until defendant precipitously changed course in the last

11

few weeks, defendant waived enforcement of any provisions of the Loan Documents literally requiring that net available funds equal or exceed projected costs. Certainly, if defendant had imposed any such requirement in January 2007, the Loan would have been deemed "in default" at inception.

33.     Indeed, if the "in balance" provisions of the Loan were enforced from inception to require that net available funds equal or exceed projected Project costs, then Magnolia arguably would have been required to deposit tens of millions of additional dollars – even at the moment of the initial Loan Closing. However, no such demand was ever made.

34.     Contradicting this, in connection with iStar's recent claim of default an officer of defendant has admitted that in iStar's view the Loan supposedly was "out of balance" and thus in default from inception – even on the day of closing in January 2007. If defendant had disclosed this astonishing position at closing – that in iStar's "*reasonable*" and "*good faith*" judgment the Loan began in an "out of balance" state and thus in a state of immediate default, Magnolia obviously would not have closed the Loan, and the individual plaintiffs would not have signed the Guaranties.

35.     Indeed, especially considering that the MMA acquisition loan was not yet due, Magnolia and individual plaintiffs Pilevsky and Zimmerman had neither reason nor need to assume substantial obligations that would place them immediately in default,

12

would require massive infusions of funds to place the brand new Loan "in balance," and would jeopardize their enormously valuable Project.

36.    Nothing was ever discussed about the Loan starting off "in default," as any such claim by iStar at that point would have caused the entire Loan to have been abandoned, ensured that Guaranties were not executed, and would have led plaintiffs to seek alternative financing arrangements.

37.    In reaching its *"reasonable"* and *"good faith"* determination under Section 3.2(D) of the Loan Agreement, defendant iStar did not issue a determination that the Loan was "out of balance." At no point during the life of the Loan, until most recently, was there ever any mention of the Loan being "out of balance," or that Magnolia needed to deposit funds to cover projected costs of construction. Such a substantial change in approach this far after closing is no longer available to iStar.

### *Force Majeure* **Delays**

38.    Each of the Loan Documents relevant to the within proceeding, including but not limited to, the Loan Agreement, the Restated Note, and each Guaranty, explicitly states that it is to be governed and construed pursuant to the laws of the State of New York, and any applicable federal laws, in a state or federal court located in New York.

39.    Although Magnolia applied for the Governmental Approvals several months before, as of the Loan closing, many, including those that would permit most on-site work, were not yet issued. Some off-site work (such as bringing utilities up to the

13

outer perimeter of the Real Property) and site work on certain "grandfathered" Sections could be and was engaged in. At the time of closing, plaintiffs and defendant anticipated that the Governmental Approvals sufficient to start most of the on-site Infrastructure would be issued within approximately two months thereafter. Notwithstanding the foregoing expectations, and although no reason was then known or anticipated for any delay in issuance of such requisite approvals and permits, plaintiffs insisted on having protection against possible adverse effects that could occur as a result of delays in issuance of Governmental Approvals. Defendant's agreement to include the *force majeure* provision in the Loan Agreement, protecting plaintiffs from the effects of unforeseen delays in the issuance of Governmental Approvals, was a material inducement to plaintiffs' taking the Loan from defendant. That provision states as follows:

> Force Majeure means a fire or other casualty, acts of God, severe, abnormal and adverse weather conditions, labor disputes or other causes beyond Borrower's or Guarantor's reasonable control (including delays due to inability to obtain labor or materials, **inability to secure governmental approvals or permits**, governmental restrictions, civil commotion, war or terrorism), provided, however, that in no event shall a Force Majeure include any event arising due to the lack or unavailability of funds, financing or capital sources. [Emphasis added] (Exhibit B, Loan Agreement, Section 1.1)

40.    This provision, making delay in the governmental approval process a *force majeure* event, is highly unusual but highly significant here.

41.    The Loan Agreement at Section 9.1(T) further states that Event(s) of Default under Sections 3.2-3.8 of the Loan Agreement are expressly subject to the *force*

14

*majeure* provision. The facts behind the fictitious default improperly alleged by iStar are directly attributable to construction delays covered by the *force majeure* provision as well as defendant's own misguided steps in disrupting the closing of Lot sales.

42.    As confirmed by several provisions in the Loan Agreement, commencing even before Loan closing, defendant was intimately involved in all decision-making aspects of the Project. For example and throughout, amongst other things, all agreements with contractors to perform the Infrastructure work require preapproval by defendant as does each Lot Sale Agreement, essentially all disbursements to contractors, as well as any design or budget changes and any other expense of the Project.

43.    To facilitate defendant's "hands-on" involvement, as required by defendant, each and every month from and after February 2007 Magnolia has delivered to defendant detailed written progress reports which included status of and progress in all work activities, on-site and off-site, communications, progress and any issues with municipal and governmental agencies, weather summaries, scheduling or projection variations, together with progress photographs of the site.

44.    On or about February 28, 2007, at a meeting in Richmond with local Builders, at which defendant's officer charged with primary oversight of the project and his assistant attended, Magnolia and defendant were notified that Chesterfield County intended to impose arbitrarily a special tax assessment against the homes to be built thereon. The taxes to be paid from such assessment were earmarked for use to improve

or extend a state toll road, the "Powhite Parkway" to traverse Chesterfield County, but which would not solely service the Project. Such tax assessment would result in a dramatic increase in individual homeowner tax liabilities and drastically impede home sales in the Project. The real estate taxes as so increased would far exceed the taxes on comparable homes in the area.

45. When Chesterfield County announced its intention to impose the special tax assessment, the applicable reviewing agencies and departments delayed or stalled the processing of the local Governmental Approvals, including an otherwise pro-forma renewal of the Project site (a.k.a. "Tentative") plan in order to "encourage" Magnolia not to oppose the capricious assessment.

46. Magnolia engaged in months of intensive negotiations with the County officials and representatives, as the assessment would have had a devastating effect on the Project, which process defendant was apprised of in detail, and even offered to join.

47. By August, 2007, Magnolia was left with no choice but to agree to a proposed "compromise" with Chesterfield County, by which the County would agree to withdraw its special tax assessment if Magnolia agreed, through the vehicle of a local "community development agency" ("CDA") format and bond sale, to perform improvements to the roadways immediately adjacent to and/or servicing the Project perimeter. This compromise plan, approved by defendant, would increase individual house taxes by less than half of the previously proposed special assessment.

48.    Magnolia understood that if it agreed to the compromise proposal, then the Tentative (site) plan for Phase 1 would be released and the permit approval processes could proceed.    However, at approximately the time the local permit processes were reactivated, the ability to obtain permits were stalled again by the Army Corps of Engineers' process in oversight and control of stream water mitigation.    The net result was that permits could not be pulled and the work needed to be able to finish Infrastructure for Phase 1 could not be commenced until December 8, 2007, a *force majeure* Governmental Approval and permit process delay of approximately ten months.

49.    Amongst other adverse consequences, these *force majeure* delays prevented the reasonably anticipated closings in 2007 of Lot sales aggregating approximately $21 million, directly affecting the cash flow for the entire Project.    Notwithstanding the impact of the *force majeure* delays, the Project remains profitable in the aggregate, with contracted sales signed and under negotiation in excess of $242 million, an as-is appraisal value in excess of $120 million, and an outstanding total Loan balance that is substantially less than either amount.

50.    To the extent any deficiency in interest reserves or payments exists or hereafter arises attributable to the aforesaid *force majeure* delays, such deficiency cannot lawfully be asserted as the basis for any default under the Loan.

51.    In connection with the CDA bond issuance, the regional investment banker and securities broker procured an updated independent appraisal of the Real Property and

the Project in its then current form, in November 2007. Pursuant to the appraisal, the fair market value of the Real Property was then $120,000,000 without taking into account the values to be added by any further Infrastructure completion.

52.     A key element and amenity of the Project development and the community to be established was and is the Golf Course. The initial plans for the Golf Course, approved by defendant, involved granting the land therefor to a golf course developer who would construct, own and run the Golf Course. However, the parties later changed plans and mutually agreed that Magnolia would itself develop and own the Golf Course.

53.     Accordingly, on or about August 15, 2007, the Loan documents were modified to reflect an increase in the Loan by the $7,000,000 estimated cost of completing the Golf Course, to $85,750,000.

54.     In connection with the August 15, 2007 modification, nowhere was it stated in the documents or otherwise, nor was it ever discussed or implied, that plaintiff Magnolia had any unfulfilled obligation, nor that there was any condition that might mature into a default, nor that the Loan was not "in balance." At that point in time, the projected costs remained far greater than any available Loan or Reserve funds. The negative differential between projected construction costs and available funds remained in the tens of millions as of August 2007, at the time of the $7 million Loan increase. Once again, having reached its *"reasonable"* and *"good faith"* determination that the Loan was not "out of balance," defendant iStar took no step toward declaring the Loan in

default. At that point, the projected proceeds of Lot sales had increased favorably to $130 million.

55.    If defendant had then raised any issue requiring either Magnolia or the Guarantors to "balance" the Loan, neither Magnolia nor the Guarantors would have agreed to changes in the Golf Course development, nor would they have entered into the August 15, 2007 increase of obligations to defendant.

56.    Throughout 2007, and well into the current year, despite the delay (and increased interest payments to defendant as a result thereof) caused by the County's permit hold-ups, defendant was continually satisfied with Magnolia, with its officers telling plaintiff Zimmerman that the Project was the best run development project in defendant's portfolio. Not until well into 2008, when its own financial problems appeared to be reaching critical mass, did defendant abruptly change the "ground rules."

57.    Notwithstanding that defendant's current interpretation and application of the balancing provisions in the Loan Agreement would otherwise have required it to do so, not once did defendant claim, allege, or otherwise indicate that the Loan was "out-of-balance" or that plaintiffs were required to make cash deposits into reserve accounts to "balance the Loan" – not when the Loan closed in January 2007, not at any time after that, nor at any point surrounding the $7 million increase of the Loan in August 2007.

58.    Notwithstanding the foregoing, by letter dated July 17, 2008, three weeks after meeting in their Texas offices with plaintiff Zimmerman and another Magnolia

principal, and after writing to reassure plaintiffs that defendant would do everything it could to help, cooperate and resolve the issues (in large part resulting from the unforeseeable permit delays) to find a solution that worked for both defendant and plaintiffs, iStar arbitrarily, without justification, and unreasonably declared that the Loan was "not in balance" and demanded that within fifteen business days Magnolia deposit into reserve with defendant $24,313,846 (or that Guarantors do so within two additional days). In addition, ignoring the *force majeure* delays that had been experienced, defendant iStar arbitrarily and without justification declared that the balance in the Interest Reserve Account was too low and demanded that plaintiffs deposit $1,238,737.23 within ten business days into the interest reserve.

59.    Plaintiffs categorically reject and deny defendant's claim that the Loan can today reasonably be declared "not in balance," that payments must be made to "balance" the Loan, that Magnolia must replenish the interest reserve, and that defendant has the right at this time to demand "balancing" or interest payments. Since the inception of the Loan without exception the projected Project costs have always exceeded net available funds. And also without exception, the reasonably anticipated cash flow from closings of sales of Lots have been projected to easily fund the entirety of the remaining Infrastructure costs – barring *force majeure* delays or interruptions or fictitious default claims by defendant.

60.    By letter dated August 4, 2008, defendant modified its July 17 demands to re-set the performance date at August 21, 2008.  (The letters of July 17, 2008 and August 4, 2008, collectively, the "Default Letters", are annexed hereto as Exhibit E.)

### Defendant's Improper Threats Concerning Unrelated Loans

61.    Affiliates of Pilevsky and defendant are parties to two other real estate development loan transactions, although the other borrower-side participants are completely unrelated to Magnolia or its other principals.

62.    The three loans are not cross-defaulted or cross-collateralized, and are totally separate commercial transactions related to real estate in three different states.

63.    Notwithstanding that the other loans have nothing to do with the Project or the Loan here, defendant has indicated that it intends to retaliate against plaintiff Pilevsky in connection with the Magnolia Project – admittedly because of acrimonious negotiations between plaintiff Pilevsky and an iStar officer on one of the unrelated deals. Confirming defendant's admitted intent, on no less than two occasions since January 2008, defendant's officers involved in the unrelated loan negotiations have made angry, inappropriate and disparaging remarks to Zimmerman about Pilevsky.

64.    Also in January 2008, unrelated to the foregoing, Magnolia expected and intended to enter into a contract to sell Section "O" of the Project, containing approximately 60 Lots.  To do so Magnolia needed and was entitled to iStar's reasonable cooperation.

21

65.    Performance of the Section "O" sale contract would have resulted in both a substantial "pay down" of Magnolia's outstanding Loan balance and a stream of payments into a reserve for the Infrastructure costs and expenses.

66.    At the time, Magnolia explained to defendant that the purchaser, an affiliate of Pilevsky, intended to purchase Section "O" as part of a like-kind exchange pursuant to the provisions of §1031 of the Internal Revenue Code, but that in order to do so, the transaction would have to close by February 4, 2008.

67.    On or about January 15, 2008, defendant approved of the sale.

68.    Shortly thereafter, defendant unjustifiably and unreasonably withdrew consent to the Section "O" contract, frustrating the sale of approximately 167 Lots.

69.    Defendant's representative acknowledged to a representative of Magnolia that defendant revoked its consent to the Section "O" contract not for reasons related to the Project or the terms of the sale, but because an affiliate of defendant was engaged in difficult negotiations with Pilevsky regarding a completely separate real estate development project in Long Island, New York, one of the two others referred to above.

70.    Defendant's withdrawal of consent and Plaintiff's resultant inability to close the Section "O" contract violated defendant's covenant of good faith and fair dealing, in addition to taking away concrete financial benefits that would have materially improved the Project's overall cash flow and eliminated even defendant's unjustifiable demands regarding the balance requirements.

22

71.    Further evidencing defendant's intentional and improper acts to subvert the Project and wrest it from plaintiffs, upon information and belief, in July 2008, a representative of defendant met with, questioned and discussed the status of the Project with one or more builders who were potential customers for Magnolia for Lot sales or, alternatively, competing developers.

72.    Upon information and belief, the nature and tenor of the questions asked and statements made by defendant's representative concerning the Project were intended or should have been anticipated to create the impression that the Project was in jeopardy, that Magnolia was not properly managing the Project, and that defendant was planning to foreclose or otherwise interrupt the Project – either such scenario sounding a false and unwarranted death knell from any reasonable Builder's vantage point.

73.    Defendant's representative knew or should have known that the negative impression created by his conduct and questions would spread within the tight-knit Richmond area community of Builders who already were or potentially would be purchasers of Lots.  Upon information and belief, such rumors have already circulated through the Builder community.

74.    As a direct, foreseeable, and proximate result of Defendant's behavior, Magnolia's ability to negotiate favorable Lot Sale Agreements, and to consummate its existing Lot Sale Agreements, has been materially impaired and/or threatened.

## AS AND FOR A FIRST CLAIM FOR RELIEF
### (Waiver, Estoppel & Acquiescence)

75.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74 hereof with the same force and effect as if set forth in full hereat.

76.    Pursuant to section 3.2 of the Loan Agreement as implemented, the Loan may reasonably be determined to be "out of balance" only if and when estimated Project costs exceed net available funds.

77.    At the time of the initial closing of the Loan, defendant iStar knew that the estimated Project costs exceeded net available funds by tens of millions of dollars.

78.    Despite the foregoing, defendant iStar proceeded to close the Loan and allowed Magnolia to become obligated pursuant to the Loan Documents.

79.    At no time during or after the initial closing of the Loan in January 2007 did iStar ever give notice or declare that the Loan was "out of balance" pursuant to section 3.2 of the Loan Agreement.  Defendant approved the Project budget before closing, at all relevant times throughout has been fully aware of the relevant figures and facts, and has re-approved the Project budget after closing at all relevant times.

80.    In August 2007 when the Loan was increased by $7 million, defendant iStar once again deliberately determined not to declare the Loan "out of balance."

24

81.    Plaintiff Magnolia to its detriment and prejudice justifiably relied on defendant iStar's deliberate and repeated determinations not to declare the Loan "out of balance" in consideration of projected Lot sales.

82.    As a consequence of the foregoing, defendant iStar is estopped from declaring the Loan "out of balance"; alternatively defendant iStar's deliberate determination not to declare the Loan "out of balance" in January 2007, its similar determination in August 2007 when the Loan was increased by $7 million, and its consistent acceptance of the state of affairs at all relevant times, constituted a knowing, intentional and voluntary waiver of any right to declare the Loan "out of balance"; alternatively, defendant iStar has acquiesced in the Loan remaining "out of balance," and may not declare an Event of Default based thereon.

83.    Plaintiffs are entitled to an order declaring and adjudicating that the Loan is not in default, and that iStar is not entitled to declare that the Loan is in default because it is "out of balance."

84.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SECOND CLAIM FOR RELIEF
### (Breach of Contract)

85.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74 and 76 through 84 hereof with the same force and effect as if set forth in full hereat.

86.    The Loan Documents provide that defendant iStar must act reasonably and in good faith in making any determination concerning the Loan being "in balance" or "out of balance." *See* Loan Agmt. § 3.2(D).

87.    On or about July 17, 2008 defendant iStar gave notice to Magnolia that iStar had determined the Loan to be "out of balance," purportedly pursuant to section 3.2(D).

88.    In determining that the Loan was allegedly "out of balance," defendant iStar failed to act in good faith and failed to act reasonably.

89.    Defendant iStar failed to act reasonably and in good faith in making the "out of balance" determination in two respects:  first, iStar failed to take into account executory Lot Sale Agreements for the sale of Lots in excess of $100 million, which amount far exceeds the relevant estimated Project costs; and second, iStar's mathematical calculations were incorrect, inaccurate and flawed.

90.    Defendant iStar's failure to act reasonably and in good faith in violation of section 3.2(D) of the Loan Agreement constituted a violation of iStar's duties owed to Magnolia, and a breach of contract as a matter of New York law.

91.    At the time the Loan Agreement was put into place, the parties reasonably contemplated that Plaintiff Magnolia would sell Lots and receive funds far in excess of the amount necessary to repay the Loan, thereby earning substantial profits as a consequence of the Project.

26

92.     Such funds to be received by Magnolia beyond the amount of the Loan were reasonably foreseeable based upon the detailed cash flow projections created in connection with the Loan Agreement.

93.     As a result of defendant iStar's breach of contract, plaintiff Magnolia has been damaged in an amount to be determined at trial and estimated to equal or exceed $250 million, including both direct and consequential damages.

## AS AND FOR A THIRD CLAIM FOR RELIEF
### (Covenant of Good Faith & Fair Dealing)

94.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, and 86 through 93 hereof with the same force and effect as if set forth in full hereat.

95.     Under New York law, in every contract, including those concerning and governing commercial, complex and sophisticated mortgage loan transactions, there exists an implied covenant requiring the parties to act in good faith and fairly in all of their contractual dealings.

96.     Defendant iStar's conduct has been reckless and undertaken in bad faith – including its impossible pronouncement that the Loan somehow stands in default despite the existence of $100 million of executed Lot Sales Agreements and related projected Project costs far less than that amount; defendant's damaging withdrawal of consent to the "Lot O Sale" based on extraneous transactions having nothing to do with Magnolia;

27

and iStar's inexplicable interference with Magnolia's construction efforts through its reckless communications with local Builders.

97.    Defendant iStar's bad faith conduct altogether has threatened the viability of the Project.

98.    Defendant iStar's bad faith conduct, in threatening the Project, has simultaneously endangered the welfare of hundreds of hard-working employees actively engaged in the construction effort, imperiled the local community of Chesterfield Community by exposing it to the blight of a partially completed and abandoned work site stretching over nearly 2,000 acres, and otherwise put at risk plaintiffs' entire plan. Infrastructure planned for the Project is expected to benefit the community of Chesterfield County as a whole by providing needed services for a growing population.

99.    Under New York law, to uphold the covenant of good faith and fair dealing, provisions of an agreement that would allow the party to shield itself from its own tortious conduct or that would deprive the other party of the fruits of the agreement, must be set aside.

100.    Accordingly, as a result of defendant iStar's bad faith, the provisions in the Loan Documents waiving plaintiffs' inalienable rights under New York law are void and unenforceable.

101.    Plaintiffs are entitled to a declaration to this effect consistent with the Court's equity's power and authority to fashion a remedy fitting the wrong and preventing

injustice, and to ensure that defendant iStar may not shield itself from its own tortious conduct.

102.   As a direct and proximate result of plaintiff's bad faith, Plaintiffs have been damaged in an amount to be determined at trial and estimated to equal or exceed $250 million.

## AS AND FOR A FOURTH CLAIM FOR RELIEF
### (Misrepresentation to Magnolia)

103.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93 and 95 through 102 hereof with the same force and effect as if set forth in full hereat.

104.   At the time of the initial Loan Closing on January 5, 2007, defendant iStar impliedly represented to Magnolia that the Loan was in a state of "balance," was not at that time "out of balance," and was not at that time in default.

105.   At the time of the initial Loan Closing on January 5, 2007, defendant iStar concealed its position that at that time the Loan was not "in balance," and that the Loan was in default, notwithstanding the existence of executed Lot Sale Agreements well in excess of $100 million.

106.   In reliance upon defendant iStar's representations aforesaid, Magnolia executed the Loan Documents.

107.   In executing the Loan Documents, Magnolia reasonably relied on defendant iStar's own determination to proceed with the Loan when the estimated costs of the

construction then underway exceeded the undisbursed Loan Proceeds and Infrastructure Reserves, knowing that iStar was taking into account the success already achieved in obtaining sufficient executed Lot Sale Agreements.

108.    In executing the Loan Documents, Magnolia was justified in relying on defendant iStar's representations.

109.    In executing the Loan Documents at the time of the $7 million increase of the Loan in August 2007, Magnolia was justified in relying on iStar's further representations and on the course of conduct that iStar had established from inception of the Loan up to that point.

110.    Defendant iStar knew and intended that plaintiff Magnolia would rely on iStar's representations concerning the Loan being "in balance" in determining to execute the Loan Documents.

111.    In light of defendant iStar's recent declaration that the Loan allegedly is "out of balance," despite that the executed Lot Sale Agreements exceed the related estimated Project costs, defendant iStar's representations at the closing concerning the Loan being "in balance" were false when made, and defendant iStar knew they were false when made.

112.    Defendant iStar's misrepresentations aforesaid directly and proximately caused and induced plaintiff Magnolia to execute the Loan Document based on false pretenses and assurances.

113.   Plaintiff Magnolia is entitled to an order declaring and adjudicating that the Loan Documents are void and unenforceable.

114.   Plaintiffs have no adequate remedy at law.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
### (Misrepresentation to Guarantors)

115.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102 and 104 through 114 hereof with the same force and effect as if set forth in full hereat.

116.   At the time of the initial Loan Closing on January 5, 2007, defendant iStar impliedly represented to plaintiffs Pilevsky and Zimmerman that the Loan was to commence in a state of "in balance," was not at that time "out of balance," and was not at that time in default.

117.   At the time of the initial Loan Closing on January 5, 2007, defendant iStar concealed its position that at that time the Loan was not "in balance," and that the Loan was in default, notwithstanding the existence of approximately $100 million of executed Lot Sale Agreements.

118.   In reliance upon defendant iStar's representations aforesaid, plaintiffs Pilevsky and Zimmerman executed the Guaranties.

119.   In executing the Guaranties, plaintiffs Pilevsky and Zimmerman reasonably relied on defendant iStar's own determination to proceed with the Loan when the estimated costs of the construction then underway exceeded the undisbursed Loan

31

Proceeds and Infrastructure Reserves, knowing that iStar was taking into account the success already achieved in obtaining approximately $100 million of executed Lot Sale Agreements.

120.    In executing the Guaranties, plaintiffs Pilevsky and Zimmerman were justified in relying on defendant iStar's representations.

121.    In executing documents intended to re-affirm the Guaranties at the time of the $7 million increase of the Loan in August 2007, plaintiffs Pilevsky and Zimmerman were justified in relying on defendant iStar's further representations and on the course of conduct that iStar had established by that point in time.

122.    Defendant iStar knew and intended that plaintiffs Pilevsky and Zimmerman would rely on iStar's representations concerning the Loan being "in balance" in determining to execute the August 2007 document.

123.    In light of defendant iStar's recent declaration that the Loan allegedly is "out of balance," despite that the executed Lot Sale Agreements far exceeding the relevant estimated Project costs, defendant iStar's implicit representations at the closing concerning the Loan being "in balance" were false when made, and defendant iStar knew they were false when made and knew that Pilevsky and Zimmerman would rely on them.

124.    Defendant iStar's misrepresentations aforesaid directly and proximately caused and induced plaintiffs Pilevsky and Zimmerman to execute the Guaranties based on false pretenses and assurances.

32

125.  Plaintiffs are entitled to an order declaring and adjudicating that the Guaranties are void and unenforceable.

126.  Plaintiffs have no adequate remedy at law.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Modification)

127.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114 and 116 through 126 hereof with the same force and effect as if set forth in full hereat.

128.  By closing the Loan without any demand that the Loan be opened "in balance," and by thereafter closing on the $7 million increase in the Loan, the parties thereby amended the provisions of the Loan Documents to eliminate any Loan balancing requirements – except to the extent any balancing took into account executed Lot Sale Agreements.

129.  Thereafter, by their course of dealing, the parties ratified such amendment.

130.  As a result, any actions by defendant to now seek enforcement of "balancing" requirements in the Loan Documents, including in the Loan Agreement and in the Guaranties, are not permitted, or are in violation of and contradict the amended provisions.

131.  As a result of the foregoing, Plaintiffs seek a judgment declaring that the provisions in the Loan Documents, including but not limited to in the Loan Agreement and in the Guaranties, with respect to "balancing" the Loan, have been deleted by

amendment and are now void and unenforceable, or alternatively may only be construed to require consideration of executed Lot Sale Agreements.

132.   Plaintiffs have no adequate remedy at law.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### (Force Majeure)

133.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126 and 128 through 132 hereof with the same force and effect as if set forth in full hereat.

134.   Section 1.1 of the Loan Agreement defines *force majeure* to include governmental restrictions, delays and/or an inability to secure governmental approvals or permits.

135.   Assuming, arguendo, that the Loan is not "in balance," and that the reserves for interest or Infrastructure costs are deficient or will become deficient, such conditions were caused by and due to acts and delays described hereinabove beyond Magnolia's control, being defined and provided for in the Loan Agreement as the results of *force majeure*.

136.   Defendant was fully apprised of, knew about and acknowledged the delays in the Governmental Approvals and accepted the delays without complaint, and even increased the Loan amount during that period of time.

34

137.   Accordingly, Magnolia is entitled to be relieved of obligations to make any "balancing" or interest payments now being demanded, or as may be demanded hereinafter (assuming, arguendo, that any such payments are otherwise due and are properly calculated), for a period of time equal to the period completion of the Project has been extended by *force majeure*.

138.   As a result, a justiciable controversy exists between Magnolia and defendant as to their rights and obligations under the Loan Agreement and particularly with respect to the impact of the *force majeure* provisions.

139.   Accordingly, plaintiffs seek judgment declaring that plaintiffs are not obligated to make deposits of either the infrastructure or interest reserve payments demanded or to be demanded by defendant for the period of time completion of the Project has been extended by *force majeure*, and that defendant's Default Letters demanding those deposits are a nullity and of no force or effect.

140.   Plaintiffs have no adequate remedy at law.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### (Assumed Risk)

141.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132 and 134 through 140 hereof with the same force and effect as if set forth in full hereat.

142.    By closing and funding the Loan without requiring plaintiffs to make any other deposits or contributions to reserves other than from the monies withheld from Loan proceeds, defendant assumed the risk of insufficient and untimely receipts of proceeds from the sale of Lots to fund reserves and to pay the Project costs and expenses.

143.    By increasing the Loan on August 15, 2007, without requiring plaintiffs to make any other deposits, defendant confirmed and perpetuated that it had assumed the risk of insufficient and/or untimely receipts of proceeds from the sale of Lots to fund reserves and to pay the Project costs and expenses.

144.    Thereafter, by defendant's course of conduct and its course of dealing with plaintiffs, defendant assumed the risk of insufficient and untimely cash flow to fund reserves and/or to pay the Project costs and expenses.

145.    Defendant, having assumed the risk, is precluded from shifting such risk to plaintiffs by now asserting a bogus entitlement to have plaintiffs contribute more than $24 million as an alleged Loan "balancing" obligation.

146.    As a result of the foregoing, plaintiffs seek a judgment declaring that defendant assumed the risk of the Loan being "out of balance" and cannot precipitously demand that plaintiffs now "balance" the Loan on demand.

147.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A NINTH CLAIM FOR RELIEF
### (Impermissible Waivers & Forfeitures)

148.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132, 134 through 140 and 142 through 147 hereof with the same force and effect as if set forth in full hereat.

149.   Under the law of New York, provisions within commercial contracts deemed to be against public policy or to represent the product of overreaching or unconscionable behavior are void and unenforceable, including provisions in commercial loan agreements purporting to provide for the waiver of rights and remedies such as the borrower's right to require that a lender "elect remedies," the borrower's historic right of redemption, the well-settled fair-market-value rights held by all mortgagors, mortgagor cure rights, and other similar rights to which parties generally are entitled at law and in equity.

150.   The Loan Documents contain multiple provisions purporting to provide for plaintiffs' waiver of virtually every known right and remedy, and purporting to impose extraordinary forfeitures on even the attempted exercise of certain rights, all of which provisions violate New York law and public policy.

151.   By way of example, under New York's substantive law, when the harm and loss to be suffered by an obligor upon strict enforcement of the terms of the documents

bears no relationship to the damages suffered by the other party, such provisions constitute an impermissible forfeiture and are void and unenforceable.

152.    Contravening this core rule of New York law and policy, under multiple provisions in the Loan Documents, including the Guaranties, defendant supposedly may recover from Magnolia and Guarantors an amount unrelated to the loss occasioned by defendants and/or in excess of the total outstanding obligations due to defendant under the Loan Documents.

153.    As a matter of law, such a windfall recovery constitutes an impermissible forfeiture.

154.    Similarly, under New York's substantive law, a mortgagor is guaranteed the right to redeem its real property from the lien of a mortgage by payment of all sums due to mortgagee.

155.    Any waiver of the fundamental right of redemption is void and unenforceable.

156.    Notwithstanding the foregoing, key provisions in the Loan Documents and Guaranties provide that defendant may recover from Magnolia and Guarantors amounts in excess of their total obligations, and thereby "clog" and prevent the free exercise of Magnolia's basic equitable right of redemption.

157.   Similarly, other Loan provisions purport to strip from plaintiffs the fundamental right to benefit from the fair-market value of the property in the event of a default.

158.   By virtue of the foregoing, plaintiffs are entitled to an order declaring and adjudicating that the Loan Documents, including each of the Guaranties, are void and unenforceable.   Alternatively, plaintiffs seek judgment declaring that the putative waivers of deficiency protections, the equitable right of redemption, fair-market-value rights, and all borrower related remedies, constitute impermissible waivers and forfeitures and are void and unenforceable.

159.   Plaintiffs have no adequate remedy at law.

## AS AND FOR A TENTH CLAIM FOR RELIEF
### (Tortious Interference)

160.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132, 134 through 140, 142 through 147 and 149 through 159 hereof with the same force and effect as if set forth in full hereat.

161.   Upon information and belief, in the summer of 2008, defendant, without Magnolia's knowledge or consent, traveled to the project, met with and/or discussed the status of the project with various Builders.

162.   Upon information and belief, defendant's communications with those builders, without Magnolia's knowledge, consent or participation, gave the impression

39

that the project and Magnolia was in financial peril and would soon be taken over by defendant.

163.    As a direct and proximate result of the foregoing, Magnolia's ability to negotiate favorable sales contracts or to enforce its existing sales contracts with Builders has been impaired.

164.    Defendant's conduct as aforesaid was undertaken solely to harm Magnolia and was wrongful and improper.    In so doing, defendant tortiously interfered with Magnolia's contractual relations and its prospective economic advantage.

165.    As a direct and proximate result of the foregoing, plaintiffs have been damaged in an amount to be determined at trial and estimated to exceed $250,000,000 plus interest, punitive damages and attorney's fees as allowed by law.

### AS AND FOR AN ELEVENTH CLAIM FOR RELIEF
#### (Declaratory Judgment – 28 U.S.C. § 2201)

166.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132, 134 through 140, 142 through 147, 149 through 159 and 161 through 165 hereof with the same force and effect as if set forth in full hereat.

167.    The Loan Documents purport to effectively eliminate Magnolia's fundamental right to file for protection under the United States Bankruptcy Code, 11 U.S. Code §301 *et seq.,* by means of springing guarantee obligations calling for $50 million

punitive assessments against Magnolia's principals, *i.e.,* individual plaintiffs Pilevsky and Zimmerman.

168.    Upon information and belief, defendant iStar incorporated the draconian $50 million springing guarantee obligations within the Loan Documents specifically to render it impossible for Magnolia's principals to prudently consider, and if necessary to invoke, the fundamental rights afforded to Magnolia under Title 11 of the U.S. Code.

169.    Upon information and belief, the springing guarantee provisions within the Loan Documents establish an illegal conflict of interest preventing Magnolia's principals and controlling partners from acting in the best interest of Magnolia and Magnolia's unsecured creditors.

170.    Furthermore, the springing guarantee provisions incorporated within the Loan Documents imperil the rights and interests of Magnolia's unsecured creditors, none of whom hold or enjoy the secured advantageous position held by defendant iStar.

171.    As a matter of public policy and federal law, the springing guarantee provisions incorporated within the Loan Documents are void and unenforceable, and loom in stark contravention of core federal policies inherent within the United States Bankruptcy Code, as well as core New York State contract law principles.

172.    Despite the foregoing, in reliance on the illegal provisions within the Loan Documents, defendant iStar has threatened to pursue relief against Magnolia and its principals.

173. A justiciable controversy exists between plaintiffs and defendant as to their rights and obligations under and pursuant to federal law.

174. Plaintiffs are entitled to judgment pursuant to section 2201 of Title 28 of the U.S. Code declaring and adjudicating that plaintiffs have no further obligations to defendant under the Loan Documents with respect to those provisions that are unconscionable, overreaching, or against public policy, including but not limited to all provisions providing for and establishing springing insider guaranties in connection with a bankruptcy filing.

175. Plaintiffs have no adequate remedy at law.

### AS AND FOR A TWELFTH CLAIM FOR RELIEF
**(Declaratory Judgment – 28 U.S.C. § 2201)**

176. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132, 134 through 140, 142 through 147, 149 through 159, 161 through 165 and 167 through 175 hereof with the same force and effect as if set forth in full hereat.

177. The Loan states that Magnolia purportedly agrees not to commence any case under the United States Bankruptcy Code, 11 U.S. Code §301 *et seq. See* Loan Agreement § 7.9. The Loan further states that Magnolia is prohibited from seeking any protection under the automatic stay provisions of the Bankruptcy Code. *Id.* §11.4.

42

178.    As a penalty for violating the purported prohibition, the Loan Documents provide for a $50 million punitive assessment against individual plaintiffs Pilevsky and Zimmerman, allegedly applicable in the event Magnolia asserts its basic rights under the Bankruptcy Code.

179.    As a matter of federal policy and law, pre-petition waivers of the right to file for protection under the Bankruptcy Code, and pre-petition waivers of the right to seek an automatic stay under the Bankruptcy Code, are unenforceable as against public policy.

180.    As a matter of federal policy and law, a pre-petition agreement purporting to provide for a $50 million punishment applicable in the event a party files for protection under the Bankruptcy Code, or seeks an automatic stay under the Bankruptcy Code, is also unenforceable as against public policy.

181.    Despite the foregoing, defendant iStar has threatened to pursue relief against Magnolia and its principals in accordance with illegal provisions contained in the Loan Documents as written.

182.    A justiciable controversy exists between plaintiffs and defendant as to their rights and obligations under and pursuant to federal law.

183.    Plaintiffs are entitled to judgment pursuant to section 2201 of Title 28 of the U.S. Code declaring and adjudicating that plaintiffs have no further obligations to defendant under the Loan Documents with respect to those provisions that are

unconscionable, overreaching, or against public policy, including but not limited to all provisions purporting to limit plaintiffs right to seek protection under the United States Bankruptcy Code, or purporting to provide for punishment against the individual plaintiffs based upon any assertion of a federal right.

184. Plaintiffs have no adequate remedy at law.

## AS AND FOR A THIRTEENTH CLAIM FOR RELIEF
### (Declaratory Judgment – 28 U.S.C. § 2201)

185. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 74, 76 through 84, 86 through 93, 95 through 102, 104 through 114, 116 through 126, 128 through 132, 134 through 140, 142 through 147, 149 through 159, 161 through 165, 167 through 175 and 177 through 184 hereof with the same force and effect as if set forth in full hereat.

186. As a matter of federal policy and law, undue limitations on the fundamental right to file for protection under the United States Bankruptcy Code are void and unenforceable.

187. Furthermore, pursuant to section 365(c) of the United States Bankruptcy Code, *ipso facto* clauses are void and executory contracts may not provide rights and remedies to a creditor additional to those afforded by the Bankruptcy Code itself, as the Code is designed and intended to preempt the field.

188.   Here, the Loan Documents purport to provide springing guaranties, which in effect grant defendant iStar an additional remedy – to wit a $50 million windfall, supposedly triggered if Magnolia files for protection under the Bankruptcy Code.

189.   The springing guarantee provisions contained within the Loan Documents are also void and unenforceable as a violation of public policy prohibiting undue limitations on a party's fundamental right to seek relief under the Bankruptcy Code.

190.   The springing guarantee provisions contained within the Loan Documents also constitute *ipso facto* clauses and as such are void and unenforceable as a violation of section 365(c) of Title 11 of the U.S. Code.

191.   Despite the foregoing, defendant iStar has threatened to pursue relief against Magnolia and its principals in accordance with the illegal provisions contained in the Loan Documents as written.

192.   A justiciable controversy exists between plaintiffs and defendant as to their rights and obligations under and pursuant to federal law.

193.   Plaintiffs are entitled to judgment pursuant to section 2201 of Title 28 of the U.S. Code declaring and adjudicating that plaintiffs have no further obligations to defendant under the Loan Documents with respect to those provisions that are unconscionable, overreaching, or against public policy, including but not limited to all provisions purporting to burden, penalize or punish plaintiffs in the event they seek protection under the United States Bankruptcy Code.

194.  Plaintiffs have no adequate remedy at law.

## PLAINTIFFS DEMAND TRIAL BY JURY

WHEREFORE, Plaintiffs Magnolia Green Development, LLC, Philip Pilevsky, and Raymond L. Zimmerman respectfully demand judgment as follows:

a.  On the First Claim for Relief, an order declaring and adjudicating that the Loan at issue in this case is not in default, and that iStar is not entitled to declare that the Loan is in default because it is "out of balance," nor based on any other fact or circumstance described or at issue herein;

b.  On the Second Claim for Relief, damages in an amount to be determined at trial and estimated to equal or exceed $250 million, including both direct and consequential damages;

c.  On the Third Claim for Relief, equitable and/or legal relief as a result of defendant's violation of its implied covenant of good faith and fair dealing;

d.  On the Fourth Claim for Relief, an order declaring and adjudicating that the Loan Documents are void and unenforceable;

e.  On the Fifth Claim for Relief, an order declaring and adjudicating that the Guaranties are void and unenforceable;

f.  On the Sixth Claim for Relief, an order declaring and adjudicating that the provisions in the Loan Documents, including but not limited to in the Loan Agreement and in the Guaranties, with respect to "balancing" the Loan, have been

deleted by amendment and are now void and unenforceable, or alternatively may only be construed to require consideration of executed Lot Sale Agreements;

g.  On the Seventh Claim for Relief, an order declaring and adjudicating that plaintiffs are not obligated to make deposits of either the infrastructure or interest reserve payments demanded or to be demanded by defendant for the period of time completion of the Project has been extended by *force majeure*, and that defendant's Default Letters demanding those deposits are a nullity and of no force or effect;

h.  On the Eighth Claim for Relief, declaring and adjudicating that defendant assumed the risk of the Loan being "out of balance" and cannot demand that plaintiffs now "balance" the Loan or make unavailable interest payments on demand;

i.  On the Ninth Claim for Relief, declaring and adjudicating that the Loan Documents, including each of the Guaranties, are void and unenforceable or, alternatively, declaring that the putative waivers of deficiency protections, the equitable right of redemption, fair-market-value rights, and all borrower related remedies, constitute impermissible waivers and forfeitures and are void and unenforceable;

j.  On the Tenth Claim for Relief, damages in an amount to be determined at trial and estimated to exceed $250 million, together with interest;

k.  On the Eleventh Claim for Relief, an order declaring and adjudicating pursuant to section 2201 of Title 28 of the U.S. Code that plaintiffs have no further obligations

47

to defendant under the Loan Documents with respect to those provisions that are unconscionable, overreaching, or against public policy, including but not limited to all provisions providing for and establishing springing guaranties in connection with a bankruptcy filing;

l.  On the Twelfth Claim for Relief, an order declaring and adjudicating pursuant to section 2201 of Title 28 of the U.S. Code that plaintiffs have no further obligations to defendant under the Loan Documents with respect to those provisions that are unconscionable, overreaching, or against public policy, including but not limited to all provisions providing for and establishing springing guaranties in connection with a bankruptcy filing;

m.  On the Thirteenth Claim for Relief, an order declaring and adjudicating pursuant to section 2201 of Title 28 of the U.S. Code that plaintiffs have no further obligations to defendant under the Loan Documents with respect to those provisions that are unconscionable, overreaching, or against public policy, including but not limited to all provisions providing for and establishing springing guaranties in connection with a bankruptcy filing;

n.  Punitive damages pursuant to governing New York law, inclusive of attorney's fees, in a total amount to be determined at trial and estimated to exceed $100 million; and

48

o. Such other and further relief as to the Court seems just and fair, including the costs

and expenses of this action.

Dated:      Uniondale, New York
            August 19, 2008

                              RUSKIN MOSCOU FALTISCHEK, P.C.

                              By: _____
                                  Mark S. Mulholland, Esq.
                                  Douglas J. Good, Esq.
                                  Attorney for Plaintiffs
                                  1425 RexCorp Plaza, East Tower
                                  Uniondale, New York 11556
                                  (516) 663-6600

49

# EXHIBIT A



TIMMONS GROUP

LOWER MAGNOLIA GREEN CONCEPTUAL PLAN
MATOACA DISTRICT • CHESTERFIELD COUNTY, VIRGINIA
LOWER MAGNOLIA GREEN - TRACT CLASSIFICATION LAYOUT

Site Development | Residential | Infrastructure | Technology

# EXHIBIT B

# TOO VOLUMINOUS TO FILE VIA ECF – HARD COPY IN CLERK'S OFFICE

# EXHIBIT C

## AMENDED, RESTATED AND MODIFIED (INCREASED) PROMISSORY NOTE

$78,750,000                                                          January 5, 2007

FOR VALUE RECEIVED, **MAGNOLIA GREEN DEVELOPMENT, LLC,** a Virginia limited liability company ("**Borrower**"), promises to pay to **iSTAR FINANCIAL INC.,** a Maryland corporation (together with its successors and assigns, "**Holder**"), or order, at 1114 Avenue of the Americas, 27th Floor, New York, New York 10036, or at such other place as Holder may from time to time in writing designate, in lawful money of the United States of America, the principal sum of SEVENTY-EIGHT MILLION SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($78,750,000) or such other sum as may be the total amount outstanding pursuant to this Note (the "**Loan**"), payable at such rates and at such times as are provided in the "**Loan Agreement**" (as hereinafter defined).

Payments of both principal and interest are to be made in lawful money of the United States of America in immediately available funds.

This Amended, Restated and Modified (Increased) Promissory Note (this "**Note**") amends and restates in its entirety that certain Promissory Note dated March 14, 2006 in the original principal amount of FIFTY-TWO MILLION FIVE HUNDRED THOUSAND DOLLARS (52,500,000) executed by Borrower in favor of MMA Financial Holdings, Inc., a Florida corporation, and assigned to Holder pursuant to that certain Allonge to Promissory Note of even date herewith.  This Note evidences Indebtedness incurred under, and is subject to the terms and provisions of, that certain Loan and Security Agreement of even date herewith, by and between Borrower and Holder (herein, as the same may be further amended, modified or supplemented from time to time, called the "**Loan Agreement**").  The Loan Agreement, to which reference is hereby made, sets forth said terms and provisions, including those under which this Note may or must be paid prior to its due date or may have its due date accelerated or extended.  The Loan Agreement also contains provisions for the payment of late charges and interest at the Default Rate, all as more specifically set forth therein.  Repayment of the Indebtedness evidenced by this Note is secured by the Mortgage and the other Loan Documents referred to in the Loan Agreement, and reference is made thereto for a statement of terms and provisions.

**Terms used but not otherwise defined herein are used herein as defined in the Loan Agreement.**

This Note may only be prepaid in accordance with the terms of Section 2.4 of the Loan Agreement (or as otherwise expressly provided elsewhere in the Loan Agreement or the other Loan Documents).  Any payment or prepayment of the outstanding principal balance of the Loan evidenced by this Note, whether voluntary or involuntary, shall be accompanied by interest accrued to the date of prepayment, the Exit Fee and the Prepayment Premium, as applicable, as provided in Section 2.4 of the Loan Agreement (except to the extent any other provision of the Loan Agreement expressly provides otherwise).

EXCEPT AS OTHERWISE EXPRESSLY PERMITTED IN THIS NOTE OR THE OTHER LOAN DOCUMENTS, BORROWER HEREBY EXPRESSLY (i) WAIVES ANY

RIGHTS IT MAY HAVE UNDER LAW TO PREPAY THIS NOTE, IN WHOLE OR IN PART, UNDERLINE WITHOUT PENALTY, UPON ACCELERATION OF THE MATURITY DATE, AND (ii) AGREES THAT IF, FOR ANY REASON, A PREPAYMENT OF ALL OR ANY PORTION OF THE PRINCIPAL AMOUNT OF THIS NOTE IS MADE, INCLUDING, WITHOUT LIMITATION, UPON OR FOLLOWING ANY ACCELERATION OF THE MATURITY DATE BY HOLDER ON ACCOUNT OF ANY DEFAULT BY BORROWER, INCLUDING, WITHOUT LIMITATION, ANY TRANSFER, DISPOSITION, OR FURTHER ENCUMBRANCE PROHIBITED OR RESTRICTED BY THE LOAN AGREEMENT, THEN BORROWER SHALL BE OBLIGATED TO PAY CONCURRENTLY WITH SUCH PREPAYMENT, THE PREPAYMENT PREMIUM AND THE EXIT FEE AS REQUIRED UNDER SECTION 2.4 OF THE LOAN AGREEMENT. BY INITIALING THIS PROVISION IN THE SPACE PROVIDED BELOW, BORROWER HEREBY DECLARES THAT (1) EACH OF THE MATTERS SET FORTH IN THIS PARAGRAPH IS TRUE AND CORRECT, (2) HOLDER'S AGREEMENT TO MAKE THE LOAN EVIDENCED BY THIS NOTE AT THE INTEREST RATES SET FORTH IN THE LOAN AGREEMENT AND FOR THE TERM SET FORTH IN THIS NOTE CONSTITUTES ADEQUATE CONSIDERATION FOR THIS WAIVER AND AGREEMENT, AND HAS BEEN GIVEN INDIVIDUAL WEIGHT BY BORROWER AND HOLDER, (3) BORROWER IS A SOPHISTICATED AND KNOWLEDGEABLE REAL ESTATE INVESTOR WITH COMPETENT AND INDEPENDENT LEGAL COUNSEL, AND (4) BORROWER FULLY UNDERSTANDS THE EFFECT OF THIS WAIVER AND AGREEMENT.

_____
On behalf of Borrower

The remedies of Holder, as provided in this Note, the Loan Agreement and the other Loan Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Holder, and may be exercised as often as occasion therefor shall occur; and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release thereof. Unless required by, and not waiveable under, applicable law in any action, sale of collateral, or other proceedings to enforce this Note, the Loan Agreement or any other Loan Document, Holder need not file or produce the original of this Note, but only need file or produce a photocopy of this Note certified by Holder to be a true and correct copy of this Note.

In the event of any dispute, action or lawsuit regarding the terms hereof, subject to the provisions of the Loan Agreement, the prevailing party will have the right to recover from the other party all court costs and reasonable attorneys' fees and disbursements incurred with respect thereto, in addition to all other applicable damages and costs.

BORROWER WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, DILIGENCE, PRESENTMENT FOR PAYMENT, DEMAND, NOTICE OF DEMAND, NOTICE OF PROTEST, NOTICE OF NONPAYMENT OR DISHONOR, NOTICE OF INTENTION TO ACCELERATE, NOTICE OF ACCELERATION, PROTEST AND NOTICE OF PROTEST OF THIS NOTE, AND ALL OTHER NOTICES (OTHER THAN AS EXPRESSLY PROVIDED IN THE LOAN AGREEMENT OR OTHER LOAN DOCUMENTS) IN CONNECTION WITH THE DELIVERY, ACCEPTANCE, PERFORMANCE, DEFAULT,

WAS01_41661962_6_208972 00587 1/4/2007 8:50 PM

OR ENFORCEMENT OF THE PAYMENT OF THIS NOTE. BORROWER FURTHER WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ALL VALUATION AND APPRAISEMENT PRIVILEGES, CLAIMS OF LACK OF DILIGENCE OR DELAYS IN COLLECTION OR ENFORCEMENT OF THIS NOTE, THE RELEASE OF ANY PARTY LIABLE, THE RELEASE OF ANY SECURITY FOR THE DEBT, THE TAKING OF ANY ADDITIONAL SECURITY AND ANY OTHER INDULGENCE OR FORBEARANCE.

Holder shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Holder, and then only to the extent specifically set forth in the writing. The acceptance by Holder of any payment hereunder which is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any remedy or remedies granted to Holder by the Loan Documents or at law or in equity at that time or at any subsequent time or nullify any prior exercise of any such right without the express consent of Holder, except as and to the extent otherwise provided by law. A waiver with reference to one event shall not be construed as continuing or as a bar to or waiver of any right or remedy as to a subsequent event.

TO THE GREATEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD DEFER TO THE SUBSTANTIVE LAWS OF ANOTHER JURISDICTION. THIS GOVERNING LAW ELECTION HAS BEEN MADE BY THE PARTIES IN RELIANCE (AT LEAST IN PART) ON SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, AS AMENDED (AS TO THE EXTENT APPLICABLE), AND OTHER APPLICABLE LAW.

TO THE GREATEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW BORROWER HEREBY CONSENTS TO THE JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF NEW YORK, STATE OF NEW YORK AND IRREVOCABLY AGREES THAT, SUBJECT TO HOLDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS NOTE OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS; PROVIDED THAT THE FOREGOING CONSENT SHALL NOT (A) DEPRIVE ANY PARTY OF THE RIGHT TO APPEAL THE DECISION OF ANY SUCH COURT TO A PROPER APPELLATE COURT LOCATED ELSEWHERE, OR (B) APPLY TO ANY FORECLOSURE OR SIMILAR ENFORCEMENT ACTION REQUIRED TO BE UNDERTAKEN UNDER THE APPLICABLE LAW OF ANOTHER JURISDICTION. THE PRECEDING CONSENTS TO JURISDICTION AND VENUE HAVE BEEN MADE BY THE PARTIES IN RELIANCE (AT LEAST IN PART) ON SECTION 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK, AS AMENDED (AND AS TO THE EXTENT APPLICABLE), AND OTHER APPLICABLE LAW. BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS MORTGAGED PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF *FORUM NON CONVENIENS*, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED

THEREBY IN CONNECTION WITH THIS NOTE, SUCH OTHER LOAN DOCUMENTS OR SUCH OBLIGATION. BORROWER DESIGNATES AND APPOINTS CT CORPORATION SYSTEM AND SUCH OTHER PERSONS AS MAY HEREAFTER BE SELECTED BY BORROWER WITH HOLDER'S APPROVAL WHICH IRREVOCABLY AGREE IN WRITING TO SO SERVE AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDINGS IN ANY SUCH COURT, SUCH SERVICE BEING HEREBY ACKNOWLEDGED BY BORROWER TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO BORROWER AT ITS ADDRESS PROVIDED IN SECTION 11.5 OF THE LOAN AGREEMENT EXCEPT THAT UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF SERVICE OF PROCESS. IF ANY AGENT APPOINTED BY BORROWER AS ITS AGENT FOR SERVICE OF PROCESS REFUSES TO ACCEPT SERVICE OF PROCESS, BORROWER HEREBY AGREES THAT SERVICE UPON IT BY MAIL SHALL CONSTITUTE SUFFICIENT SERVICE. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF HOLDER TO BRING PROCEEDINGS AGAINST BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.

Whenever used, the singular number shall include the plural, the plural shall include the singular, and the words "Holder" and "Borrower" shall be deemed to include their respective successors and assigns.

All notices which Holder or Borrower may be required or permitted to give hereunder shall be made in the same manner as set forth in Section 11.5 of the Loan Agreement.

In the event any one or more of the provisions hereof shall be invalid, illegal or unenforceable in any respect, the validity of the remaining provisions hereof shall be in no way affected, prejudiced or disturbed thereby.

Borrower acknowledges that Holder may, in its sole discretion, sell all or any part of its interest in the Loan evidenced by this Note, including, without limitation, for purposes of effecting a Securitization.

Notwithstanding anything to the contrary contained in this Note or any other Loan Documents, to the fullest extent permitted by applicable law, Holder's rights hereunder shall be reinstated and revived, and the enforceability of this Note and the other Loan Documents shall continue, with respect to any amount at any time paid on account of the Loan which thereafter shall be required to be restored by Holder pursuant to a court order or judgment (whether or not final or non-appealable), as though such amount had not been paid. The rights of Holder created or granted herein and the enforceability of the Loan Documents at all times shall, to the fullest extent permitted by applicable law, remain effective to cover the full amount of the Loan even though the Loan, including any part thereof or any other security or guaranty therefor, may be or hereafter may become invalid or otherwise unenforceable as against any other party and whether or not any other party shall have any personal liability with respect thereto.

-4-

BORROWER AND HOLDER BY ACCEPTANCE OF THIS NOTE MUTUALLY, EXPRESSLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY FOR ANY PROCEEDINGS BETWEEN BORROWER AND HOLDER ARISING OUT OF OR IN CONNECTION WITH THIS NOTE, OR ANY OTHER LOAN DOCUMENT, IN THE INTEREST OF AVOIDING DELAYS AND EXPENSES ASSOCIATED WITH JURY TRIALS.

Borrower and holder, by acceptance of this Note, hereby agree that the Loan Documents supersede any prior oral or written agreements of the parties. Without limiting the generality of the foregoing, in the event of conflict between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

Time is of the essence for the performance of each and every covenant of Borrower hereunder or under the other Loan Documents. No excuse, delay, act of God, or other reason, whether or not within the control of Borrower, shall operate to defer, reduce or waive Borrower's performance of any such covenant or obligation.

Borrower shall be fully and personally liable, jointly and severally, for payment and performance of the obligations and indebtedness evidenced by this Note, as set forth in Section 11.13 of the Loan Agreement, the terms of which are incorporated herein by reference.

(END OF PAGE)

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note the day and year first above written.

<u>BORROWER:</u>

**MAGNOLIA GREEN DEVELOPMENT, LLC**, a Virginia limited liability company

By:   **MAGNOLIA GREEN DEVELOPMENT MEMBER, LLC**, a Virginia limited liability company, its Sole Member

    By:   **MAGNOLIA GREEN DEVELOPMENT HOLDINGS, LLC**, a Virginia limited liability company, its Sole Member

       By:   **RAYKAT, INC.**, a Virginia corporation, its Manager

          By: _____
          Name: Raymond L. Zimmerman
          Title:  President

# EXHIBIT D

# TOO VOLUMINOUS TO FILE VIA ECF – HARD COPY IN CLERK'S OFFICE

EXHIBIT E



**VIA OVERNIGHT DELIVERY**

July 17, 2008

Magnolia Green Development, LLC
c/o Lifestyle Homes, LLC
5423 Henneman Drive, Suite B
Norfolk, Virginia 23513
Attn: Raymond L. Zimmerman
Telephone: 757-962-5299

Philip Pilevsky
c/o Philips International Holding Corp.
295 Madison Avenue
New York, New York 10017

Raymond L. Zimmerman
3000 Island Lane
Virginia Beach, Virginia 23454

Re:    OUT OF BALANCE NOTICE -- Loan from iStar Financial Inc., a Maryland corporation
       (with its successors and assigns, the "**Lender**") to Magnolia Green Development, LLC, a
       Virginia limited liability company (the "**Borrower**") in the amount of $85,750,000 (the
       "**Loan**"); iStar Loan No.: M001363;01

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement between Lender and Borrower
dated as of January 5, 2007, as amended by that certain Omnibus Modification Agreement dated
as of August 15, 2007 (and as further amended from time to time, the "**Loan Agreement**"). *All
capitalized words used but not otherwise defined herein shall have the meanings ascribed thereto
in the Loan Agreement.*

As you are aware, Section 3.2(D) of the Loan Agreement provides, in pertinent part, that
"[n]otwithstanding anything to the contrary herein, it is agreed that the Loan shall at all times be
"in balance."" Please be advised that Lender has determined in good faith in accordance with the
terms of the Loan Agreement that the Loan is *not* "in balance," in that the undisbursed principal
balance of the Loan (giving effect to all escrow reserves and retainage) combined with amounts in
the Infrastructure Reserve Account are less than the amount necessary to pay for: (i) all Hard
Costs for work done and not theretofore paid for or to be done in connection with the Completion

of Construction Work in accordance with the Plans and Specifications based on Lender's Estimate of Construction Costs for Phase I and the Golf Course Parcel (which are currently under construction), and (ii) all Soft Costs and other costs payable by Borrower under this Agreement or otherwise in connection with the Construction Work for Phase I and the Golf Course Parcel until Completion of the Construction Work, in each case based on the Budget (as modified to reflect cost savings and/or reallocations to the extent permitted hereunder). The amount required to cause the Loan to be "in balance" is $24,630,038.00 (as calculated as set forth on Exhibit A attached hereto and made a part hereof) less the $316,191.70 balance in the Infrastructure Reserve Account as of June 30, 2008, for a total deficiency of $24,313,846.30 (the "**Shortfall**"). In the event that Lender determines that Phase II is also currently under construction, additional amounts will be required to cause the Loan to be "in balance", and Lender hereby expressly reserves all rights under the Loan Documents with respect thereto.

Under the terms of Section 3.2(D) of the Loan Agreement, this letter constitutes written notice by Lender that the Loan is not "in balance" and Borrower is required, within fifteen (15) Business Days after this notice, to deposit with Lender or into the Infrastructure Reserve Account the amount of the Shortfall in cash or cash equivalents or post an irrevocable letter of credit in form and substance, and from an issuer, acceptable to Lender (including without limitation permitted partial draws) for said Shortfall. Lender hereby demands that Borrower cause the Loan to be "in balance". Borrower's failure to cause the Loan to be "in balance" within said fifteen (15) Business Days shall be an Event of Default under the Loan Documents. In addition to any other rights or remedies of Lender hereunder or at law or in equity, Lender shall not be obligated to disburse proceeds of the Loan or amounts from the Infrastructure Reserve until the Loan is "in balance". Pursuant to the Completion Guaranty, Guarantors have guaranteed Borrower's obligation to keep the Loan "in balance" and this letter shall also serve as written demand on Guarantors under Section 1(e) of the Completion Guaranty to deposit the Shortfall amount if Borrower fails to do so within two (2) Business Days.

Furthermore, as of the date hereof, the current balance of the Interest Reserve Account is $935,068.99.00. Pursuant to Section 5.16 of the Loan Agreement, "[i]f and to the extent that the balance in the Interest Reserve Account is less than the amount required to pay three (3) months of interest on the Loan at the then current Base Rate (the "**Minimum Interest Reserve Balance**"), Borrower shall be required to deposit with Lender for deposit in the Interest Reserve Account sufficient funds to replenish said account to the Minimum Interest Reserve Balance not later than ten (10) Business Days after written request therefor." This letter shall serve as written request for the deposit within ten (10) Business Days of the Minimum Interest Reserve Balance in the amount of $1,238,737.23, which is calculated based on the interest due for August, September and October, 2008 at the Base Rate and taking into account the current balance in the Interest Reserve Account, as more particularly set forth on Exhibit B attached hereto and made a part hereof. Furthermore, commencing October 1, 2008, monthly payments will be due from Borrower to replenish the Minimum Interest Reserve Balance as set forth on Exhibit B.

The foregoing is not an exhaustive list of Defaults or Events of Default existing at this time under the Loan Documents and nothing herein shall be considered a waiver by Lender of (i) any existing Defaults or Events of Default not enumerated herein, or (ii) Lender's right to declare additional Defaults or Events of Default under the Loan Documents whether such Defaults or Events of Default exist at this time or not. This letter does not constitute a waiver of any term, provision,

condition, covenant, or agreement contained in the Loan Agreement or in any of the other Loan Documents, nor shall it (i) operate as a waiver of any right, power, remedy or privilege of Lender thereunder, (ii) prejudice or preclude any other or further exercise of any right or remedy of Lender provided by law or in equity, (iii) entitle Borrower to any other or further notice or demand whatsoever, or (iv) in any way modify, change, impair, affect, diminish, or release any obligation or liability of Borrower under or pursuant to any of the Loan Documents.

Lender hereby reserves all rights and remedies available to it under the Loan Documents and under applicable Law without further notice to the extent permitted under the Loan Documents. Lender further reserves its right at any time and from time to time to take any action available to it under any of the foregoing which it deems appropriate under the circumstances in its good faith sole discretion, including without limitation the right to declare a potential Default or Event of Default under the Loan Documents by reason any other fact or circumstances constituting a potential Default or Event of Default under the Loan Documents.

Please contact the undersigned at 972.720.5490 or by email at PKofoed@istarfinancial.com regarding the deposit of the Shortfall amount and the Minimum Interest Reserve Balance.

Very truly yours,

iStar Financial Inc., a Maryland corporation

By: _____
Name:  Peter Kofoed
Its:  Senior Vice President

cc: iStar Financial Inc.
1114 Avenue of the Americas, 27th Floor
New York, New York 10036
Attn: Nina B. Matis, Esq./General Counsel
Loan No. M001363:1
Telephone: 212-930-9406

iStar Asset Services Inc.
180 Glastonbury Blvd., Suite 201
Glastonbury, Connecticut 06033
Attn: President
Loan No. M001363:1
Telephone: 860-815-5900

Katten Muchin Rosenman LLP
1025 Thomas Jefferson Street, N.W.
Suite 700E
Washington, DC 20004-5201
Attn: Virginia A. Davis, Esq.
Katten Reference: 208972-00533
Telephone: 202-625-3602

Philips International Holding Corp.
295 Madison Avenue
New York, New York 10017
Attn: Sheila Levine
Telephone: 212-951-3838

Troutman Sanders LLP
1001 Haxall Point
Richmond, Virginia 23219
Attn: Edward B. Kidd
Telephone: 804-697-1445

EXHIBIT A

Magnolia Green Cost to Complete Phase I &
Golf Course Parcel

| PHASE I | | |
|---|---|---|
| Off site improvement budget | | |
|    Original budget | $10,493,000 | |
|    Work completed to date | -7,282,357 | |
|    Balance to complete | 3,210,643 | |
|    10% Contingency | +321,064 | |
| **Total cost to complete off site** | | **$3,531,707** |
| | | |
| Parcel A - 124 lots | | |
|    Contract value ($21,892/lot) | $2,714,625 | |
|    Cost to complete | | 257,517 |
| | | |
| Parcel B – 67 lots | | |
|    Contract value ($25,032/lot) | $1,677,174 | |
|    Cost to complete | | 104,130 |
| | | |
| The average cost per lot for the work completed to date on Parcel A and Parcel B and the contract let for Parcel F is $26,523.  Using $26,500 per lot, following are the costs to complete each lot in the remainder of Phase I. | | |
| | | |
| Parcel C - no infrastructure costs | | - |
| Parcel D - no infrastructure costs | | - |
| Parcel E - 78 lots | | 2,067,000 |
| Parcel F – 29 lots (contract awarded) = $32,646/lot | | 946,739 |
| Parcel G – 31 lots | | 821,500 |
| Parcel H – 70 lots | | 1,855,000 |
| Parcel I – 49 lots | | 1,298,500 |
| Parcel J – 44 lots | | 1,166,000 |
| Parcel K – 160 lots | | 4,240,000 |
| Parcel M - no infrastructure costs | | - |
| Parcel N - no infrastructure costs | | - |
| **Total hard costs to complete lots** | | **$12,756,386** |
| | | |
| Soft costs for Parcels C-K based upon 20% of hard costs for those parcels ($14,909,300 x 20% = $2,981,847) | | $2,981,847 |
| | | |
| **Total cost to complete Phase I** | | **$19,269,940** |
| | | |
| **Golf Course cost to complete** ($3,787,817 hard + 1,085,000 engineering + 10%) | | **$5,360,098** |
| | | |
| **Total cost to complete Phase I & Golf Course Parcel** | | **$24,630,038** |

EXHIBIT B

Interest Calculation

[attached hereto]

Adjustable Amortization Schedule
Magnolia Land #1363

IStar Asset Services

Copy of 1363 Magnolia Amortization Schedule.xls

7/17/2008 12:54 PM

iSTAR FINANCIAL INC.
1114 Avenue of the Americas
39th Floor
New York, New York 10036

VIA OVERNIGHT DELIVERY

August 4, 2008

Magnolia Green Development, LLC
c/o Lifestyle Homes, LLC
5423 Henneman Drive, Suite B
Norfolk, Virginia 23513
Attn: Raymond L. Zimmerman
Telephone:  757-962-5299

Philip Pilevsky
c/o Philips International Holding Corp.
295 Madison Avenue
New York, New York  10017

Raymond L. Zimmerman
3000 Island Lane
Virginia Beach, Virginia  23454

Re:    OUT OF BALANCE NOTICE -- Loan from iStar Financial Inc., a Maryland corporation
       (with its successors and assigns, the "**Lender**") to Magnolia Green Development, LLC, a
       Virginia limited liability company (the "**Borrower**") in the amount of $85,750,000 (the
       "**Loan**"); iStar Loan No.: M001363:01

Ladies and Gentlemen:

Reference is made to that certain Loan and Security Agreement between Lender and Borrower
dated as of January 5, 2007, as amended by that certain Omnibus Modification Agreement dated
as of August 15, 2007 (and as further amended from time to time, the "**Loan Agreement**"). *All
capitalized words used but not otherwise defined herein shall have the meanings ascribed thereto
in the Loan Agreement.*

Reference is also made to that certain letter dated July 17, 2008 (the "**Default Notice**") whereby
Lender made demand upon Borrower to cause the Loan to be brought "in balance" and deposit in
the Interest Reserve Account sufficient funds to replenish said account to the Minimum Interest
Reserve Balance required pursuant to the terms of the Loan Agreement, each within the
timeframes set forth therein (collectively, the "**Additional Deposits**").

Lender hereby notifies Borrower that the date by which Borrower is required to make the Additional Deposits is hereby extended to August 21, 2008 (such date inclusive of any grace periods set forth in the Loan Agreement). For purposes of clarification, Borrower's failure to cause the Loan to be "in balance" on or before August 21, 2008, or to replenish the Interest Reserve Account to the Minimum Interest Reserve Balance on or before August 21, 2008, shall each constitute an Event of Default under the Loan Documents.

Lender hereby also restates and reaffirms its written demand on Guarantors under Section 1(e) of the Completion Guaranty to deposit the Shortfall (as defined in the Default Notice) if Borrower fails to do so within two (2) Business Days.

Nothing herein shall be considered a waiver by Lender of (i) any existing Defaults or Events of Default not enumerated herein or in the Default Notice, or (ii) Lender's right to declare additional Defaults or Events of Default under the Loan Documents whether such Defaults or Events of Default exist at this time or not. This letter does not constitute a waiver of any term, provision, condition, covenant, or agreement contained in the Loan Agreement or in any of the other Loan Documents, nor shall it (i) operate as a waiver of any right, power, remedy or privilege of Lender thereunder, (ii) prejudice or preclude any other or further exercise of any right or remedy of Lender provided by law or in equity, (iii) entitle Borrower to any other or further notice or demand whatsoever, or (iv) in any way modify, change, impair, affect, diminish, or release any obligation or liability of Borrower under or pursuant to any of the Loan Documents.

Lender hereby reserves all rights and remedies available to it under the Loan Documents and under applicable Law without further notice to the extent permitted under the Loan Documents. Lender further reserves its right at any time and from time to time to take any action available to it under any of the foregoing which it deems appropriate under the circumstances in its good faith sole discretion, including without limitation the right to declare a potential Default or Event of Default under the Loan Documents by reason any other fact or circumstances constituting a potential Default or Event of Default under the Loan Documents.

Please contact Elisha Blechner at 212.930.9451 or by email at Eblechner@istarfinancial.com regarding the deposit of the Shortfall amount and the Minimum Interest Reserve Balance.

Very truly yours,

iStar Financial Inc., a Maryland corporation

By: _____

Name:

Its:

**William Burns**
**Senior Vice President**

cc:  iStar Financial Inc.
    1114 Avenue of the Americas, 27th Floor
    New York, New York 10036
    Attn: Nina B. Matis, Esq./General Counsel
    Loan No. M001363:1
    Telephone: 212-930-9406

    iStar Asset Services Inc.
    180 Glastonbury Blvd., Suite 201
    Glastonbury, Connecticut 06033
    Attn:  President
    Loan No. M001363:1
    Telephone: 860-815-5900

    Katten Muchin Rosenman LLP
    1025 Thomas Jefferson Street, N.W.
    Suite 700E
    Washington, DC 20004-5201
    Attn: Virginia A. Davis, Esq.
    Katten Reference: 208972-00533
    Telephone: 202-625-3602

    Philips International Holding Corp.
    295 Madison Avenue
    New York, New York 10017
    Attn: Sheila Levine
    Telephone: 212-951-3838

    Troutman Sanders LLP
    1001 Haxall Point
    Richmond, Virginia 23219
    Attn: Edward B. Kidd
    Telephone: 804-697-1445